| | | |
|---|---|---|
| **MICHAEL H. KALINER, Trustee for Debtor, MDC Systems, Inc.,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **NO. 2:09-MC-00005-JD** |
| **v.** | : | |
| | : | |
| **MDC SYSTEMS CORP., LLC, ROBERT MCCUE, MDC SYSTEMS ENTERPRISES, LLC, and MDC SYSTEMS ENTERPRISES LLC SERIES A,** | : | |
| | : | |
| **Defendants.** | | |

**DuBOIS, J.**　　　　　　　　　　　　　　　　　　　　　　　　**January 19, 2011**

**M E M O R A N D U M**

## I. INTRODUCTION

Plaintiff Michael H. Kaliner ("Kaliner" or "the trustee"), as Chapter 7 trustee for debtor MDC Systems, Inc. ("INC"), brings this action to recover for the benefit of the estate's creditors assets he alleges were fraudulently transferred by INC to defendants Robert McCue ("McCue"), MDC Systems Corp., LLC ("LLC"), MDC Systems Enterprises, LLC ("Enterprises"), and MDC Systems Enterprises LLC Series A ("Series A") (collectively, "the defendants"). The Fourth Amended Complaint alleges successor liability claims against LLC (Count I) and Enterprises and Series A (Count IV), and fraudulent transfer claims against LLC (Count II) and McCue (Count III).[1]

---

[1] Although Count II is styled as a "fraudulent conveyance" claim and Count III is styled as a "fraudulent transfer" claim, counsel for plaintiff represented to the Court during a telephone conference on May 7, 2010 that plaintiff uses the terms "fraudulent conveyance" and "fraudulent

Presently before the Court are motions for summary judgment filed separately by LLC and McCue and a motion for summary judgment filed jointly by Enterprises and Series A. For the reasons set forth below, defendants McCue, Enterprises, and Series A's motions for summary judgment are granted and defendant LLC's motion for summary judgment is granted in part and denied in part.

## II. BACKGROUND[2]

This case, which involves a series of asset transfers between INC, McCue, and the corporate defendants, evolved out of an effort to enforce a state-court judgment against INC in a landlord-tenant action. The Court begins by describing the asset transfers and relationships between the various parties, the lease dispute giving rise to the present action, and the procedural history of this case.

### A. The Relationship Between INC, LLC, and McCue

Robert McCue formed INC in December 1996 to provide project and construction management consulting services. (Resp. of Michael H. Kaliner to the LLC Statement of Undisputed Material Facts ¶ 53; Def. MDC Systems Corp., LLC's Answer to Pl.'s Add'l Material Facts ¶ 53.) (hereinafter, "Pl.'s Stmt." and "Def. LLC's Resp. to Pl.'s Stmt."). INC in turn formed LLC in 2000 as a Pennsylvania limited liability company. (Def. MDC Systems Corp., LLC's Separate Statement of Undisputed Material Facts in Support of Mot. for Summ. J. ¶¶ 1, 11 (hereinafter "Def. LLC's Stmt."); Pl.'s Stmt. ¶¶ 1, 11.) Since June 13, 2001, INC's board of directors has consisted of

_____

transfer" interchangeably.

    [2] The following facts are undisputed unless otherwise noted and are presented in the light most favorable to the trustee.

McCue, James McKay, and Stephen Cheney. (Def. LLC's Stmt. ¶ 9; Pl.'s Stmt. ¶ 9.) And since February 1997, INC's outstanding shares have been held by three shareholders: McCue, with 39.4% of INC's shares, and McKay and William Wheatley, each with 30.3% of INC's shares. (Def. LLC's Stmt. ¶ 8; Pl.'s Stmt. ¶ 8.) McCue was in charge of INC's day-to-day operations and had the authority to sign checks on behalf of both INC and LLC. (Pl.'s Stmt. ¶¶ 92-93; Def. LLC's Resp. to Pl.'s Stmt. ¶¶ 92-93.)

On June 11, 2004, INC's board of directors recommended to its shareholders that INC wind up its affairs and dissolve. (Def. LLC's Stmt. ¶ 15; Pl.'s Stmt. ¶ 15.) That recommendation was approved by INC's shareholders on July 5, 2004. (Def. LLC's Stmt. ¶ 16; Pl.'s Stmt. ¶ 16.) The next day, the board tentatively approved a proposed plan of liquidation and dissolution submitted by McCue, and McCue acquired a 100% ownership interest in LLC from INC for $400. (Pl.'s Stmt. ¶¶ 21, 59-60; Def. LLC's Stmt. ¶ 60; Def. LLC's Resp. to Pl.'s Stmt. ¶ 59; Def. LLC's Mot. for Summ. J., Ex. G.) The board subsequently gave its final approval of the McCue proposal. (Pl.'s Stmt. ¶ 60; Def. LLC's Stmt. ¶ 60; Def. LLC's Mot. for Summ. J., Ex. G.) At the time of final approval, INC's obligations included equipment leases, an office lease with Brandywine Operating Partnership, L.P. ("Brandywine") in Berwyn, Pennsylvania, two bank loans, and professional fees and consulting invoices. (Def. LLC's Stmt. ¶ 22; Pl.'s Stmt. ¶ 22.)

On November 18, 2004, INC, McCue, and LLC entered into an agreement, effective July 6, 2004, in which LLC, as "buyer," contracted to assume certain obligations and liabilities of INC, the "seller." (Def. LLC's Mot. for Summ. J., Ex. O.) In the agreement, INC and LLC agreed, inter alia, that INC would sublease to LLC the office space it leased from Brandywine; LLC would accept assignments of INC's equipment leases unless the lessors preferred to terminate the leases; and LLC

would assume one of INC's bank loans in consideration for certain fixtures, furniture, and equipment.  (Id. ¶¶ 1.1-1.5, 1.7.)  INC also agreed to subcontract its existing consulting contracts to LLC and to deliver to LLC amounts that had been pre-paid by clients as retainers to the extent that INC had not already performed on those assignments.  (Id. ¶ 1.6.)  In return, LLC agreed to assume management and administrative services of INC's existing consulting contracts and pay INC three percent of gross revenues collected on invoices of those cases "from the effective date of th[e] Agreement until the earlier of the date of termination of the contract or the date that [INC's] business [became] wound up."  (Id. ¶ 2.1(g).)

LLC began performing INC's existing consulting contracts on July 6, 2004, operating out of the same premises as INC.  (Pl.'s Stmt. ¶ 56, 62, 63, 96; Def. LLC's Resp. to Pl.'s Stmt. ¶ 56, 62, 63, 96.)  After INC terminated all its employees at the end of June 2004, some of INC's employees became LLC employees, while INC's other employees were hired by LLC as consultants.  (Pl.'s Stmt. ¶¶ 94-95; Def. LLC's Resp. to Pl.'s Stmt. ¶¶ 94-95.)  When INC ceased day-to-day operations in June 2004, LLC continued to operate under the name "MDC Systems," using the same website, telephone number, and letterhead used by INC.  (Pl.'s Stmt. ¶¶ 94, 97; Def. LLC's Resp. to Pl.'s Stmt. ¶¶ 94, 97.)

## B.  The Relationship Between LLC, Enterprises, Series A, and McCue

According to Kaliner, Enterprises is a Delaware "series" entity that is part of LLC, and Series A is the first "series" entity that was created under Enterprises.  (Pl.'s Resp. to Defs. Enterprises and Series A's Mot. for Summ. J., at 2.)  Enterprises was formed in September 2007, with LHE Partners, LLC—an entity in which McCue held a partial interest—holding a partial ownership interest in Enterprises.  (McCue Dep., Dec. 1, 2009, at 415-21, Doc. No. 47-6, filed Mar. 2, 2010.) (hereinafter

"McCue Dep. III.") Series A is the current operating entity for the MDC Systems business enterprise. (Pl.'s Statement of Add'l Material Facts in Response to the Second Mot. for Summ. J. of MDC Systems Enterprises LLC and MDC Systems Enterprises LLC Series A ¶ 3; Defs. MDC Systems Enterprises LLC's and MDC Systems Enterprises LLC Series A's Answer to Pl.'s Statement of Add'l Material Facts ¶ 3.) According to Mitchell Swann, part owner of LLC,[3] Series A was formed some time in July 2008, with Swann and McCue holding, through their respective LLCs, partial ownership interests in the entity. (Swann Dep. at 41-49, Doc. No. 76-2, filed July 22, 2010.)

Beginning July 2008, Series A essentially assumed the operations of LLC. (See Aug. 8, 2008 Letter from Robert C. McCue and E. Mitchell Swann, Doc. No. 78, filed under seal July 23, 2010.) On July 1, 2008, McCue and Swann, as partners of LLC, agreed that: LLC would "become a service organization to supply personnel, office space and office services to . . . Series A"; all new proposals for work would be placed under Series A's name; Series A would "assume responsibility for the billings" from August 1, 2008 forward; and Series A and LLC would "enter consulting agreements for such services as each may need in the future[,] . . . at cost without mark-up or fees." (Meeting Minutes - MDC Systems Corp. LLC, July 31, 2008, Doc. No. 77-2, filed July 22, 2010.) Under this arrangement, new client contracts generally were formed with Series A rather than LLC, and the revenue from new projects generally went to Series A. (Swann Dep. at 80-81.) Series A operated, and continues to operate, in the same space occupied by LLC in July 2008. (McCue Dep. III at 444; Swann Dep. at 95-96.) Although Series A initially used LLC's employees to perform work on new

---

[3] Some time between January 1, 2005 and November 30, 2005, Mitchell Swann obtained a 20% ownership interest in LLC, decreasing McCue's 100% ownership interest to 80%. (Def. LLC's Mot. for Summ. J., Ex. M.)

contracts, at the end of December 2008, LLC terminated all its employees, who were then hired by Series A. (McCue Dep. III at 304-06; Swann Dep. at 96-98.) Other than collecting old receivables, LLC no longer has a source of revenue. (Id. at 441-42.)

### C. Lease Dispute Between Brandywine and INC

The present action traces back to a lease dispute between Brandywine, as landlord, and INC, as tenant. INC and Brandywine entered into a commercial lease for the rental of commercial and storage space in Berwyn, Pennsylvania on July 31, 2002. (Third Amend. Compl., Ex. A.) By letter dated June 29, 2005, Brandywine informed INC that it was in default of $53,476.17, representing unpaid rent and related charges through June 30, 2005. (Def. LLC's Stmt. ¶ 38; Pl.'s Stmt. ¶ 38.) Brandywine filed suit against INC in the Court of Common Pleas of Chester County on July 29, 2005, alleging breach of contract. (Def. LLC's Stmt. ¶ 39; Pl.'s Stmt. ¶ 39.) In an opinion issued November 19, 2007, following a bench trial, the Court of Common Pleas found in favor of Brandywine and against INC for non-payment of rent and concluded that LLC unlawfully occupied the leased premises.[4] (Def. LLC's Mot. for Summ. J., Ex. Q.) On March 27, 2008, the state court denied INC's Motion for Post-Trial Relief and entered judgment against INC for $1,071,024.53, plus interest and costs. (Def. McCue's Mot. for Summ. J., Ex. C (Doc. No. 46, filed Feb. 3, 2010).) The

---

[4] Under the terms of the INC-Brandywine lease, INC was required to obtain Brandywine's consent to "assign, transfer or hypothecate" the lease. (Third Amend. Compl., Ex. A, ¶ 12(a).) Although LLC contends that McCue and George Johnstone, Brandywine's Senior Vice President of Operations, engaged in many discussions regarding assignment of the commercial lease to LLC, Kaliner maintains that Brandywine was never asked to consent to a sublease or to the addition of LLC as an obligor under the lease. (Pl.'s Stmt. ¶¶ 108-09; Def. LLC's Resp. to Pl.'s Stmt. ¶¶ 103-05, 108-09.) And although LLC, while operating out of the commercial space leased by INC from Brandywine, paid rent to Brandywine between July 2005 and December 2006, (Def. LLC's Stmt. ¶ 35; Pl.'s Stmt. ¶ 35), Kaliner asserts that Brandywine "would not necessarily know the source of the payments" because "rent payments go to a lock box for direct deposit." (Def. LLC's Stmt. ¶ 36; Pl.'s Stmt. ¶ 36.)

total represented damages for accrued rent and additional rent through the trial date, plus accelerated rent for the balance of the lease term, attorney's fees, and costs. (Def. LLC's Stmt. ¶ 42; Pl.'s Stmt. ¶ 42.) INC and LLC vacated the premises on December 29, 2007, and Brandywine rented the space to another company, which took possession in July 2008. (Def. LLC's Stmt. ¶¶ 44, 102; Pl.'s Stmt. ¶¶ 44, 102, 113; Def. LLC's Resp. to Pl.'s Stmt. ¶¶ 102, 113.)

### D.  Procedural History

To collect on the state court judgment against INC, Brandywine filed an action ("the second state court action") in the Court of Common Pleas of Chester County against INC, LLC, and McCue on September 14, 2007, alleging breach of contract, fraudulent transfer, ejectment, and common law fraud. (Def. LLC's Stmt. ¶ 43; Pl.'s Stmt. ¶ 43.) On July 23, 2008, INC filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (See In re MDC Systems Inc., No. 08-14669-ELF (Bankr. E.D. Pa), Doc. No. 1.) The bankruptcy proceeding was converted to a Chapter 7 proceeding on October 7, 2008, and Kaliner was appointed trustee the following day. (See id., Doc. Nos. 65, 67.) Brandywine then removed the second state court action to the bankruptcy court on November 21, 2008. (See id., Doc. No. 79.) On April 27, 2009, this Court: (1) upon motion of the defendants, withdrew reference of the removed state court action from the bankruptcy court, and (2) upon motion of the trustee, substituted Kaliner as plaintiff and dismissed INC as defendant. On April 23, 2010, Kaliner then filed a Fourth Amended Complaint, adding Enterprises and Series A as defendants. The Fourth Amended Complaint alleges successor liability claims against LLC (Count I) and Enterprises and Series A (Count IV), and fraudulent transfer claims against LLC (Count II) and McCue (Count

III).[5]  Presently pending are the motions for summary judgment filed by LLC, Enterprises and Series

A, and McCue.

## III.  LEGAL STANDARD

In considering a motion for summary judgment, "the court is required to examine the

evidence of record in the light most favorable to the party opposing summary judgment, and resolve

all reasonable inferences in that party's favor."  Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory

allegations or suspicions" to support its claim.  Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969

(3d Cir. 1982).  After examining the evidence of record, a court should grant summary judgment if

"the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the

governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (citation omitted).

---

[5] The Court dismissed all claims against LLC in Count III of the Fourth Amended
Complaint "based on plaintiff's statement that Count III was intended to assert only a fraudulent
transfer or fraudulent conveyance claim against Robert McCue."  (Doc. No. 67, filed May 7,
2010.)

## IV. THRESHOLD ISSUES

Before examining the defendants' arguments regarding the fraudulent conveyance and successor liability claims, the Court addresses three threshold issues that bear on the trustee's standing to bring this action and the validity of the state court judgment on which this action is based. Specifically, the defendants argue that: (1) the in pari delicto defense bars Kaliner from bringing this action; (2) Kaliner lacks standing to bring claims on behalf of INC's creditors; and (3) Kaliner does not have a valid cause of action because the underlying state court judgment is invalid. The Court addresses each issue in turn.

### A. The In Pari Delicto Doctrine

The defendants argue that Kaliner is barred from bringing this action by the equitable defense of in pari delicto, which provides that "a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 354 (3d Cir. 2001). In actions brought by a trustee under Section 541 of the Bankruptcy Code, the "trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." Id. at 356 (internal citation omitted). According to the defendants, INC could not have brought fraudulent transfer and successor liability claims against any of them because the Complaint alleges that INC itself participated in the alleged fraudulent transfers to them. Thus, the defendants argue, Kaliner, standing in INC's shoes, is barred from bringing these claims.

Defendants' argument fails. The applicability of the in pari delicto defense is dependent upon the language of the particular Bankruptcy Code section at issue. Lafferty, 267 F.3d at 356.

-9-

Kaliner was substituted as plaintiff based on § 544(b)(1) of the Code.  (Mot. of Michael H. Kaliner, Trustee and Brandywine Operating Partnership, L.P. to Substitute Trustee as Plaintiff (Doc. No. 8, filed Mar. 9, 2009).)  While the in pari delicto defense applies to actions brought by the trustee as successor to the debtor's interest under § 541, it does not apply to § 544 avoidance actions.  The Lafferty court held that because § 541 states that the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of bankruptcy," courts may not take into account events that occur after the commencement of the bankruptcy case—and are thus barred from considering whether a trustee's status as an innocent successor renders the in pari delicto defense inapplicable.  267 F.3d at 356-58.  Unlike § 541, however, nothing in the language of § 544 precludes courts from considering the effect of a trustee's substitution as plaintiff when determining whether in pari delicto applies.  See 11 U.S.C. § 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ."); cf. In re The Pers. & Bus. Ins. Agency, 334 F.3d 239, 245-46 (3d Cir. 2003) (holding in pari delicto inapplicable to actions brought under § 548 of Bankruptcy Code because § 548 does not contain limiting language of § 541).  Thus, the Court concludes that the in pari delicto defense does not apply to this case.[6]

### B.  The Trustee's Standing to Bring Claims on Behalf of INC's Creditors

The defendants also argue that Kaliner lacks standing to bring § 544(b)(1) avoidance claims on behalf of INC's creditors.  In support, they cite Caplin v. Marine Midland Grace Trust Co. of New

---

[6] In addition, "strong equitable arguments . . . favor courts' consideration of post-petition events" in actions based on a trustee's avoidance powers.  In re The Pers. & Bus. Ins. Agency, 334 F.3d at 246.  When a trustee comes to the court with clean hands and represents the interests of innocent creditors, the court may consider the trustee's substitution in determining the applicability of the in pari delicto defense.  Id. at 246-47.

York, 406 U.S. 416 (1972), in which the Supreme Court held that a reorganization trustee under Chapter X of the old Bankruptcy Act did not have standing to assert, on behalf of the debtor's debenture holders, claims against the indenture trustee of the debentures. Additionally, the defendants argue that Kaliner lacks standing because a bankruptcy trustee cannot bring claims that are personal to specific creditors. Defendants' standing arguments also fail.

First, the defendants err in their reliance on Caplin; Caplin is inapposite to this case. In Caplin, the Supreme Court based its holding in part on the fact that the statutory scheme did not provide or suggest that a reorganization trustee should assume the responsibility of suing third parties on behalf of creditors. 406 U.S. at 428-29. By contrast, § 544(b)(1), the Bankruptcy Code section applicable to this case, explicitly provides that the trustee may avoid transfers and obligations that are "voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1) (emphasis added); see In re PWS Holding Corp., 303 F.3d 308, 314 (3d Cir. 2002) ("§ 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate.").

Second, a § 544(b)(1) action benefitting creditors nevertheless may be an action to recover money for the estate. The Third Circuit has recognized that:

> Simply because the creditors of a[n] estate may be the primary or even the only beneficiaries of such a recovery does not transform the action into a suit by the creditors. Otherwise, whenever a lawsuit constituted property of an estate which has insufficient funds to pay all creditors, the lawsuit would be worthless since under Caplin it could not be pursued by the trustee.

Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 349 (3d Cir. 2001) (quoting In re Jack Greenberg, Inc., 240 B.R. 486, 506 (Bankr. E.D. Pa. 1999)); cf. Marion v. TDI Inc., 591 F.3d 137, 148 (3d Cir. 2010) (receiver for corporation had standing to bring action

against third parties for assisting corporation in Ponzi scheme because, though lawsuit would benefit investors, receiver was acting to collect money due the receivership). Thus, "it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an inflow of money to the estate that will immediately flow out again to repay creditors." Lafferty, 267 F.3d at 348-49.

Third, contrary to defendants' assertions, Kaliner's claims are not personal to any specific creditor; rather, they are general claims that will benefit the entire estate. It is well settled that a recovery under § 544(b)(1) inures to the benefit of all unsecured creditors, including those who individually had no right to avoid the debtor's pre-bankruptcy transfers or obligations. Buncher Co. v. Official Comm. of Unsecured Creditors of Genfarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000); Moore v. Bay, 284 U.S. 4, 4-5 (1931). In fact, "an entire transfer can be set aside even though the creditor's claim is nominal and even though the avoidance may provide more funds than necessary to pay the creditors and the administrative expenses of the case." 5 Collier on Bankruptcy, ¶ 544.06[4] (16th ed. 2010); see also Moore, 284 U.S. at 4-5.

## C. Validity of the State Court Judgment

LLC claims that Kaliner does not have a valid cause of action in this case because he is suing in Brandywine's stead to void transfers from INC to defendants even though Brandywine is not an actual creditor of INC.[7] Brandywine's status as creditor is based on the underlying state court judgment that Brandywine obtained against INC. However, according to LLC, this state court

---

[7] Although any money recovered by the trustee will benefit all creditors of the estate, a trustee is empowered to bring a § 544(b) action only if an actual unsecured creditor exists. See In re Cybergenics Corp., 226 F.3d 237, 243 (3d Cir. 2000) ("[A] trustee or debtor in possession can use [the avoidance] power [in § 544(b)] only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action."). The only "actual" unsecured creditor referenced in Kaliner's Fourth Amended Complaint is Brandywine.

judgment is invalid because the state court never had subject-matter jurisdiction.  LLC further

challenges the state court judgment as a "double recovery" not permitted by Pennsylvania law and

asserts that, because Brandywine overstated the amount of rentable space in the lease, Brandywine

owes INC for overpaid rent.[8]

Resolution of these issues involves a two-step inquiry: (1) does the Rooker-Feldman

doctrine[9] or full-faith-and-credit principle prohibit the Court from revisiting the state court

judgment?; (2) if not, did the state court have subject-matter jurisdiction?  If the state court had

subject-matter jurisdiction,[10] its judgment is valid, and the Court cannot delve into questions of state

law, such as whether INC is owed overpaid rent, or whether the state-court judgment constituted a

"double recovery."  On the other hand, if the state court did not have subject-matter jurisdiction,

Brandywine's judgment against INC is invalid and Kaliner has no claim in this case because

Brandywine would not be an actual unsecured creditor of INC.

---

[8] The state court judgment provides that INC pay rent and accelerated rent to Brandywine. LLC argues that this is a double recovery because Brandywine repossessed the property with five years remaining on the INC lease term and relet the space to another tenant, thus allowing it to collect rent money both from INC and from the new tenant during the remaining five years on the INC lease term.
    LLC also argues that Brandywine owes it $78,000 in overpaid rent because "the amount of rentable space was exaggerated in the Lease by twelve and a half percent."  (Def. LLC's Mot. for Summ. J. at 78.)  INC raised this argument before the state court, which decided the issue against INC.  (Def. LLC's Mot. for Summ. J., Ex. Q, at 11.)

[9] See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923).

[10] The parties do not dispute that the Chester County Court had personal jurisdiction over INC.

1. <u>Does This Court Have Authority to Review the State Court Judgment Under Rooker-Feldman or the Full-Faith-and-Credit Principle?</u>

Both LLC and Kaliner frame the question of this Court's authority to review the state-court judgment as a question of whether the <u>Rooker-Feldman</u> doctrine applies. Under the <u>Rooker-Feldman</u> doctrine, "federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments." <u>Great W. Mining & Mineral Co. v. Fox Rothschild LLP</u>, 615 F.3d 159, 165 (3d Cir. 2010).

However, the question of the Court's authority to review the state court judgment is not a question of whether <u>Rooker-Feldman</u> applies. The Supreme Court has made clear that <u>Rooker-Feldman</u> is "confined to cases . . . <u>brought by state-court losers</u> complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005) (emphasis added). Kaliner—who represents Brandywine in this action—was not a state-court loser. To the contrary, Kaliner seeks to enforce the state court judgment against INC by recovering assets that it alleges were fraudulently transferred to the defendants.

Rather than the <u>Rooker-Feldman</u> doctrine, the relevant inquiry is whether the Court must afford full faith and credit to the state court judgment.[11] The Full Faith and Credit statute requires that "Acts, records and judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. Generally, however, "a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State . . . had

---

[11] The parties have not briefed the applicability of the full-faith-and-credit principle.

jurisdiction . . . to render the judgment." Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n, 455 U.S. 691, 704 (1982) (quoting Durfee v. Duke, 375 U.S. 106, 110 (1963)). Thus, if the state court did not have either personal or subject-matter jurisdiction, full faith and credit need not be given.

However, because principles of res judicata apply to questions of jurisdiction, if the state court "fully and fairly litigated and finally decided" the question of its jurisdiction, its jurisdictional determination is entitled to full faith and credit, and a federal district court may not disturb the state court judgment. Underwriters, 455 U.S. at 706 (quoting Durfee, 375 U.S. at 111); see Grey v. New Jersey, 91 F. App'x 747, 750-51 (3d Cir. 2003) ("[J]urisdictional determinations are not exempted from the precepts of res judicata . . . ."). To "fully and fairly litigate[] and finally decide[]" an issue, a state court must "satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." See Kremer v. Chem. Constr. Corp., 456 U.S. 461, 481 (1982). Otherwise, the state court judgment is constitutionally infirm and there can be no constitutionally recognizable preclusion. Id. at 482-83.

In this case, INC raised for the first time its objection to the state court's subject-matter jurisdiction two months before the scheduled trial date. The state court deemed INC's objection a "delaying tactic" and denied INC's motion to dismiss for lack of subject-matter jurisdiction. (Def. LLC's Mot. for Summ. J., Ex. Q; Def. LLC's Reply to Pl.'s Answer to Def. LLC's Mot. for Summ. J., Ex. C (hereinafter "Def. LLC's Reply").) The state court found that "defendant having voluntarily litigated this matter for two years in this Court is deemed to have waived [the forum selection clause in the lease between INC and Brandywine]." (Def. LLC's Reply, Ex. C.)

The Court need not determine whether this ruling is entitled to full faith and credit. Even

assuming, <u>arguendo</u>, that the full-faith-and-credit principle is inapplicable, the Court concludes that the state court had subject-matter jurisdiction.

### 2. Did the State Court Have Subject-Matter Jurisdiction?

LLC argues that the Court of Common Pleas of Chester County ("Chester County Court") did not have jurisdiction over the state court action because the lease agreement between Brandywine and INC contains a forum selection clause specifying that the state courts in Montgomery, Delaware, and Philadelphia counties, and the federal courts in the Eastern District of Pennsylvania are to have "exclusive jurisdiction." (Third Amend. Complaint, Ex. A, ¶ 38.)

Contrary to LLC's contentions, however, the Chester County Court had subject-matter jurisdiction because a forum selection clause specifying that an action shall proceed in a particular venue can never oust a court in a different venue of its jurisdiction over the case. The courts of common pleas "have unlimited original jurisdiction of all actions and proceedings," <u>see</u> 42 Pa. C.S.A. § 931(a), and "private parties may not by contract prevent a court from asserting its jurisdiction or change the rules of venue." <u>Cent. Contracting Co. v. C.E. Youngdahl & Co., Inc.</u>, 418 Pa. 122, 133 (1965); <u>see</u> <u>Churchill Corp. v. Third Century, Inc.</u>, 578 A.2d 532, 535-36 (Pa. Super. Ct. 1990) (holding that Pennsylvania had both personal and subject-matter jurisdiction despite parties' contractual agreement to litigate in Missouri). This is true even though a court in which venue and jurisdiction is proper "should decline to proceed with the cause" when the parties have agreed to litigate in another forum and where "such agreement is not unreasonable at the time of litigation." <u>Cent. Contracting</u>, 418 Pa. at 133 (emphasis added). Thus, even if the Chester County Court could have declined to exercise jurisdiction and honored the parties' choice of forum, the forum selection clause could not and did not deprive the court of subject-matter jurisdiction. The

Court therefore concludes that the Chester County Court's judgment against INC is valid and that its findings and conclusions on the merits are res judicata.

## V.  FRAUDULENT TRANSFER AND SUCCESSOR LIABILITY CLAIMS

With respect to the fraudulent transfer and successor liability claims, the defendants raise the following arguments: (1) the successor liability claims and parts of the fraudulent transfer claims are not § 544 avoidance claims; (2) the fraudulent transfer claim against McCue is time-barred; and (3) Kaliner does not have valid claims for successor liability or for fraudulent transfer under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA").  The Court concludes that summary judgment is appropriate as to the successor liability claims against LLC, Enterprises, and Series A, and the fraudulent transfer claim against McCue, but inappropriate as to the fraudulent transfer claim against LLC.

### A.  Defendants' Argument That the Successor Liability Claims and Parts of the Fraudulent Transfer Claims Are Not Section 544 Avoidance Claims

The defendants argue that because § 544(b) only authorizes a trustee to "avoid any transfer of an interest of the debtor in property," Kaliner may not pursue the successor liability claims or the portions of his fraudulent transfer claims that seek injunctive relief against future transfers, a constructive or resulting trust, or an accounting.  Kaliner does not respond to this argument.

Under Pennsylvania law, "[w]hen one company sells or transfers all of its assets to another company," an action for successor liability may be maintained to hold the "purchasing or receiving company . . . responsible for the debts and liabilities of the selling company."  Continental Ins. Co. v. Schneider, Inc., 582 Pa. 591, 599-600 (2005).  A successor liability action is not an avoidance action.  Whereas the remedy in a successor liability action is to hold the purchasing or receiving

company liable for the selling company's debts, the goal of an avoidance action is to avoid the transfer of assets to the successor company in the first instance. The Court thus concludes that § 544(b) does not empower Kaliner to bring claims for successor liability and grants summary judgment in favor of LLC, Enterprises, and Series A on those claims.

With respect to LLC's and McCue's objection that Kaliner may not pursue the portions of his fraudulent transfer claims that seek injunctive relief against future transfers, a constructive or resulting trust, or an accounting, the Court concludes that Kaliner may seek such relief in this action. Not only does PUFTA expressly provide for such relief,[12] but such relief falls within the Court's equitable powers and may be ordered as necessary to ensure that the allegedly fraudulent transfers at issue in this case are successfully avoided.

### B. McCue's Argument That the Fraudulent Transfer Claim Against Him is Time-Barred

McCue argues that the PUFTA claim against him is time-barred because 12 Pa. C.S.A. § 5109, the applicable statute of limitations,[13] extinguishes fraudulent transfer claims unless an action is brought (1) "within four years after the transfer was made," or (2) "if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."

---

[12] See 12 Pa. C.S.A. § 5107 (available remedies include avoidance of transfer, "attachment or other provisional remedy against the asset transferred or other property of the transferee," "injunction against further disposition . . . of the asset transferred or of other property," appointment of receiver, or "any other relief the circumstances may require").

[13] McCue properly characterizes 12 Pa. C.S.A. § 5109 as a "statute of repose." However, the comment to § 5109 refers to the section as a "statute of limitation." The Pennsylvania Superior Court has noted: "The language of [§ 5109], which involves the extinguishment of a cause of action rather than a limitation on the action, would appear to be labeled properly as a statute of repose. However, the comment to section 5109 refers to that provision as imposing a statute of limitations. We will refer to the section in accordance with the comment." K-B Building, Co. v. Sheesley Construction, Inc., 833 A.2d 1132, 1133 n.1 (Pa. Super. Ct. 2003).

INC's bankruptcy petition was not filed until July 23, 2008, and Kaliner's Fourth Amended Complaint—which for the first time included a PUFTA claim against McCue—was not filed until April 23, 2010.

As a general rule, a PUFTA action is extinguished if it is not brought within four years after the allegedly fraudulent transfer was made.  <u>See</u> 12 Pa. C.S.A. § 5109.  McCue argues that the transfer of LLC to McCue "was made" on July 6, 2004—which means the statute of limitations expired on July 6, 2008.  Kaliner, on the other hand, asserts that the transfer occurred when memorialized in the November 18, 2004 agreement between INC, McCue, and LLC.[14]  PUFTA provides that a "transfer is made when it becomes effective between the debtor and the transferee." 12 Pa. C.S.A. § 5106(3).  The November 18, 2004 agreement expressly states that it is "effective as of the 6th day of July 2004."  (Def. LLC's Mot. for Summ. J., Ex. O, at 1.)  In addition, the LLC membership certificate, dated July 6, 2004, clearly states that "FOR VALUE RECEIVED, MDC Systems, Inc. hereby sells, assigns and transfers unto Robert C. McCue the Membership Interest represented by the within Certificate."  (Pl.'s Answer to Robert McCue's Mot. for Summ. J., App'x at 330-31, Doc. No. 47-12, filed Mar. 2, 2010.)  The Court therefore concludes that, for purposes of PUFTA, the transfer of INC's interest in LLC to McCue "was made" on July 6, 2004, and Kaliner's filing of the PUFTA claim against McCue on April 23, 2010 occurred well beyond § 5109's four-year limitations period.

A claim under PUFTA may be brought more than four years after the allegedly fraudulent

---

[14] If the transfer from LLC to McCue was made on November 18, 2004, the limitations period would have expired on November 18, 2008.  However, Section 108(a) of the Bankruptcy Code would have extended the limitations period to July 23, 2010—i.e., two years from the date the bankruptcy petition was filed.  <u>See</u> 11 U.S.C. § 108(a); <u>Cantor v. Perelman</u>, 414 F.3d 430, 440 (3d Cir. 2005).

transfer was made, however, if it is brought "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." 12 Pa. C.S.A. § 5109(1). Kaliner claims that although Brandywine knew of LLC's existence in July 2005, the transfer of INC's interest in LLC to McCue was not known until document production in early June 2009. McCue, on the other hand, asserts that Brandywine knew or reasonably could have known of the transfer in July 2005 because George Johnstone, Brandywine's Senior Vice President of Operations, testified that he assumed at that time that "LLC was Bob McCue." (Def. McCue's Reply Brief in Support of His Mot. for Summ. J., at 9 (citing Johnstone Dep., Aug. 6, 2009, at 63).) Regardless of whether Johnstone's testimony is sufficient to demonstrate that Brandywine knew of the transfer of LLC to McCue as early as July 2005, Brandywine certainly learned, or should have learned, of the transfer on May 7, 2008. On that day, McCue testified at a deposition in the underlying state court proceedings that INC "sold [its] interest [in LLC] to [McCue]." (McCue Dep., May 7, 2008, at 119-20.) Because the PUFTA claim against McCue was not filed until April 23, 2010—well over a year after Brandywine discovered the transfer of INC's interest in LLC to McCue—the Court concludes that the claim is extinguished.

### C. LLC's Argument That Kaliner Does Not Have a Valid Claim Under PUFTA

LLC argues that there are no genuine issues of material fact requiring a trial on Count II, the PUFTA claim against LLC for allegedly transferring its business enterprise to INC. PUFTA provides that irrespective of whether a creditor's claim arose before or after the debtor made an allegedly fraudulent transfer, the transfer is fraudulent if it was made:

> (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer . . ., and the debtor: (i) was engaged or was about to engage in a business or a transaction for

which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. C.S.A. § 5104(a) (emphasis added). A transfer is not fraudulent under § 5104(a)(1), however, against a person who "took in good faith and for a reasonably equivalent value." 12 Pa. C.S.A. § 5108(a). With respect to a creditor whose claim arose before the transfer was made, § 5105 imposes liability if the transfer was made "without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 12 Pa. C.S.A. § 5105.

The Court concludes that summary judgment is inappropriate on this issue, as there are genuine issues of material fact concerning: (1) whether INC acted with "actual intent to hinder, delay or defraud any creditor" when making the transfers, (2) whether LLC accepted the transfers in good faith, (3) whether INC received "reasonably equivalent value in exchange for the transfer[s]," and (4) whether INC was insolvent at the time of the transfers or became insolvent as a result of the transfers.[15] With respect to the first two issues, the record does not definitively demonstrate that INC did not effect the transfers with the intent to escape liability to Brandywine or to any other present or future creditor, or that LLC accepted the transfers in good faith. In particular, the parties present conflicting evidence on the question of whether any of the factors in 12 Pa. C.S.A. § 5104(b)—an

---

[15] LLC urges the Court to disregard as "sham affidavit" the Declaration of George Johnstone (Doc. No. 72-2, filed June 1, 2010), which was filed in conjunction with Kaliner's response to LLC's motion for summary judgment. In concluding that genuine issues of material fact exist with respect to the fraudulent transfer claim against LLC, the Court does not rely on the two statements in Johnstone's Declaration which, according to LLC, contradict the testimony offered by Johnstone at his deposition on August 6, 2009. Thus, the Court need not reach the issue of whether the Declaration is a "sham affidavit."

inexhaustive list of eleven factors that may be considered in determining actual intent under § 5104(a)(1)—are present in this case.

The parties also present conflicting evidence as to whether INC received "reasonably equivalent value" in exchange for the transfers to LLC. Though LLC argues that the only assets it purchased from INC were fixtures, furniture, and equipment for $42,000, Kaliner contends that LLC acquired much more, including INC's "existing contracts, good will, furniture, fixtures and equipment, employees, telephone number, use of the MDC Systems name and other intellectual property, data bases and website, business location and release of McCue's covenant not to compete." (Pl.'s Resp. to Def. LLC's Mot. for Summ. J., at 15.) While LLC characterizes its assumption of INC's existing contracts as a sublease arrangement, Kaliner asserts that in effect, INC transferred its existing contracts to LLC. And with respect to the $42,000 payment for INC's fixtures, furniture, and equipment, Kaliner argues that the $42,000 was not a payment at all, but rather an undertaking by LLC to pay an outstanding loan balance in that amount to Eagle Bank—a loan for which LLC was already an "unlimited" co-guarantor and therefore already had liability for payment. (Id. at 19 (citing Pl.'s Answer to Robert McCue's Mot. for Summ. J., App'x at 430-37, Doc. No. 47-14, filed Mar. 2, 2010).)

Regarding insolvency, PUFTA provides that "[a] debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." 12 Pa. C.S.A. § 5102(a). LLC contends that INC was not insolvent either at the time of the transfer or after the transfer because its financial statements show substantial stockholders' equity: $636,184 as of March 31, 2004; $524,620 as of September 30, 2004; and $524,620 as of December 31, 2004. (See Def. LLC's Mot. for Summ. J., Exs. J, K, L.) Kaliner, on the other hand, argues that INC was insolvent because although it

retained its accounts receivable after the transfers to LLC, they were only sufficient to pay the debt to Eagle Bank. Citing to deposition testimony from McCue, Kaliner asserts that INC's accounts receivables "were already long overdue in June 2004 and remained unpaid three years later in July 2007," and that the largest receivable (of almost $500,000) was owed by Stone & Webster Engineering, a company that, according to Kaliner, already was in bankruptcy in June 2004. (Pl.'s Resp. to Def. LLC's Mot. for Summ. J., at 16 (citing McCue Dep., July 27, 2007, at 194-95; McCue Dep., July 20, 2009, at 107-12).) In light of the conflicting evidence presented by the parties, the Court concludes that whether INC was insolvent at the time of the transfers to LLC or became insolvent as a result of the transfers is a question properly left to the determination of the jury.

## VI. CONCLUSION

For the reasons stated above, defendants McCue, Enterprises, and Series A's motions for summary judgment are granted and defendant LLC's motion for summary judgment is granted in part and denied in part. The only claim remaining in this case is Count II, the fraudulent transfer claim against LLC. An appropriate order follows.